FILED

2006 NOV -2 PM 3: 35

CENTRAL DISTRICT COURT OF CALIF.
BY _____ LOS ANGELES

1 **PAUL E. POTTER, SBN 93002**
POTTER, COHEN & SAMULON
2 3852 East Colorado Boulevard
Pasadena, California   91107
3 (626) 795-0681

4 **TERRENCE J. BENNETT, SBN 53149**
Post Office Box 709
5 Pasadena, California   91102-0709
(626) 798-6675
6

7 **KENNETH A. REED, SBN 133567**
404 W. Fourth Street, Suite C
Santa Ana, California 92701
8 (714) 953-7400

9 Attorneys for Defendant
**JOHN WILLIAM STINSON**
10

11

12                    UNITED STATES DISTRICT COURT

13                    CENTRAL DISTRICT OF CALIFORNIA

14 UNITED STATES OF AMERICA,        Case No.: CR-02-938-RGK

15                     Plaintiff,   **POINTS AND AUTHORITIES IN
                                    SUPPORT OF DEFENDANT STINSON'S
16     vs.                          MOTION TO STRIKE THE ADMISSION
                                    OF GOVERNMENT EXHIBIT 2A FOR
17 JOHN W. STINSON,                 VIOLATION OF THE COURT'S ORDER
                                    REGARDING THE SEARCH OF
18                     Defendants.  FEDERAL INMATE DAVID SAHAKIAN
                                    CELL
19

20

21     PLEASE TAKE NOTICE that at a date time and set by the

22 court, or as soon thereafter as the matter can be heard in the

23 courtroom of Hon. R. Gary Klausner of the above-entitled

24 court, that defendant, John Stinson, through his attorneys of

25 record, will move the court to rule that proposed Government

26



DOCKETED ON CM
          2006
NOV  7 2006

BY _____ 172

1  Exhibits 2a and 3a be deemed inadmissible as fruits of a

2  violation of the express procedures set down by the court for

3  the search of David Sahakian's cell.

4      The motion will be based on this notice of motion, on all

5  the papers and records on file in this action, and on such

6  oral and documentary evidence as may be presented at the

7  hearing of the motion.

8  Dated: October 31, 2006.

9

10                                    _____
                                      Kenneth A. Reed
11                                    Attorney for defendant
                                      John Stinson
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## POINTS AND AUTHORITIES

After an exparte motion was filed on behalf of David Sahakian by his attorneys of record, concerning the procedure for the search of Mr. Sahakian's cell, the district court made rulings and set down procedures for how the searches were to be performed.  The Court ordered\1/:

## REQUIRED READING

"That prior to searching, the searching ATF agents must sign a form that they had read the court's order, the accompanying documents, and that they would conduct the search in accordance with the requirements and procedures set down by the court."

As will be shown by the prior testimony of the witnesses that conducted the search, the government employees conducting the search violated Judge Gilbert's order from the start. There was no signed form executed by the searching agents, in fact  the search was not even conducted by the ATF agents\2/. The search of David Sahakian's cell was performed by personnel of the Bureau of Prisons, neither of the BOP officers that searched Mr. Sahakian's cell signed the form required by the court.

///

///

---

1 A copy of the Court order is attached as exhibit 1

2. Witnesses testified that the search was performed by personal from the Bureau of Prisons.

///

**Instructions:**

The court specifically set forth instructions by which the search was to be conducted:

1.     . . . the search was to be conducted by agents or other personnel of the Bureau of Alcohol, Tobacco and Firearms. The searching agents have selected in part because they will have no further role in the investigation of this matter; under no circumstances should the case agents view any of the documents that may contain privileged information seized during the execution of the warrant.

On the day of the search of David Sahakian's cell, the search was not conducted by Joshua Knapp, the only ATF agent at USP Marion at time of the search, the search was performed by members of the investigative arm of the Bureau of Prisons, commonly known as SIS. Mr. Knapp testified during the United States v Mills trial that he did not actually conduct the search, that the search was actually conducted by personnel of Bureau of Prisons, though he was on the cell block supervising the searches. ATF agent Knapp admitted that he was not actually at the door watching the searches as they were performed by the BOP personnel.\3/

One of the BOP officers who performed the search of Mr. Sahakian's was Bryon Tolson. Mr. Tolson also testified in the Mills trial, he testified that he did not read the court order, nor does not recall if he was briefed on the court ordered procedures of the search by ATF agent Knapp.

---

3. Mr. Knapp's testimony is attached as exhibit 2.

Finally, Mr. Tolson did not recall whether or not ATF agent Knapp was present at the time he was briefed by his superiors prior to the search Mr. Sahakian's cell.\4/

Mr. Tolson's lack of memory to the contrary and not withstanding, there is no evidence that Mr. Tolson signed the "I have read . . . ." clause of the Court Order as required by the district court judge.

Another BOP employee that testified in the Mills trial regarding the search of Mr. Sahakian's cell\5/, was Rick Ellet. Mr. Ellet was an SIS employee of BOP at the time of the Sahakian search. SIS is the investigative arm of the Bureau of Prisons. The seized boxes were stored in the office of the SIS for at least two weeks prior to being sent to the court mandated special master. During that time the investigative arm of the BOP located at USP Marion had access to those documents. Mr. Ellett further testified that they were told to just take everything and box it up. [*testimony of Ellet, US v Mills Page 38, lines 18-19 July 6, 2006*] This was clearly not the instructions set forth in Judge Gilbert's memorandum.

After viewing the video tape of the cell search during his testimony, Mr. Ellet agreed that the boxes were sealed by he and fellow BOP employee, Byron Tolson. Mr. Ellett testified that the boxes were then taken to the SIS office. Finally Mr. Ellet testified that he had no knowledge of the fact the federal court judge had set forth the procedures of how the search was to be conducted. [*testimony of Ellet, US v Mills Page 45, lines 14-18 July 6, 2006*]

---

4. Mr. Tolson's Testimony is attached hereto as exhibit 3
5 Mr. Ellet's testimony is attached hereto as exhibit 4.

1

### CONCLUSION

2      In light of the foregoing, it is respectfully maintained

3 that the court should find that government violated the

4 federal court order which provided for procedures that were

5 to be followed in the search of David Sahakian's cell, the

6 cell search that allegedly produced government exhibit's 2a

7 and 3a.  It is clear that the neither ATF agent or the BOP

8 personnel followed the Court order in their search of Mr.

9 Sahakian's cell.  It is equally clear that the order was

10 designed to prevent the very problem that has arisen in this

11 case, the introduction of tainted fruit into the trial.

12

13

14

15                          Kenneth A. Reed
                           Attorney for defendant
16                         John Stinson

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

OCT 1 7 2002

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
BENTON OFFICE

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

DAVID MICHAEL SAHAKIAN,
RICHARD SCOTT MCINTOSH, and
CARL EDGAR KNORR

    Defendants.

Case No. 99-cr-40044-JPG
Mag. Cases

*EX PARTE*
UNDER SEAL
*Unsealed per order at to 10-24-02 doc 649*

## ORDER

    This matter comes before the Court for case management purposes. The Court hereby **ORDERS** that the stay shall be lifted on the execution of any search warrants issued for the cells of defendants David Michael Sahakian, Richard Scott McIntosh and Carl Edgar Knorr under the following conditions:

- Materials designated by a defendant as legal material ("Materials") and sought in the search warrant may be seized but may not be examined by the prosecutors in this case or any government agent involved in this case until confirmed by the Court not to be covered by the attorney-client privilege;

- In compliance with the conditions of the search application and warrant, government agents not involved in this case (the "Taint Team") or a Special Master may examine the seized Materials to make a preliminary determination as to whether the Materials are covered by the attorney-client privilege;

- Upon motion from the government, the Court will review *in camera* any seized Materials that the government believes are not privileged and that the government wishes to share with the prosecutors in this case or any government agent involved in this case to confirm

*644*

Exh. 1

that they are not covered by the attorney-client privilege;

- The prosecutors in this case and any government agent involved in this case will be permitted to examine materials confirmed by the Court not to be covered by the attorney-client privilege regardless of their designation by a defendant as legal material;

- Materials deemed to be covered by the attorney-client privilege by the Taint Team, a Special Master or the Court shall be returned to the defendants as soon as possible in compliance with prison regulations;

- All other aspects of the search warrant are effective as originally issued.

Clerk of Court is **DIRECTED** to send a copy of this order forthwith to Warden E.A. Stepp, USP-Marion, 4500 Prison Road, P.O. Box 2000, Marion, IL 62959, and to fax the order to Warden Stepp at 618-964-1895 who shall keep this document confidential.

**IT IS SO ORDERED.**
**DATED: October 17, 2002**

J. PHIL GILBERT
DISTRICT JUDGE

2

[Schedule 1]

PROCEDURE FOR SEARCH OF INMATE'S LEGAL MATERIAL

A.    INTRODUCTION

This memorandum is designed to serve as a guide for the agents and others participating in the search of the personal property of inmate **DAVID SAHAKIAN**, located at the United States penitentiary at Marion, Illinois.  Because of the likelihood that documents designated as legal material by the inmate will be encountered during this search, the following guidelines must be followed.  These guidelines set forth a procedure designed to minimize any intrusion into privileged material and to ensure that no privilege is violated.

It is important that you take the time to familiarize yourself with the contents of this memorandum, the affidavit in support of the search warrant, and the warrant itself.  Please retain your copies of this memorandum, the affidavit, and the warrant, and refer to them as necessary during your search.

B.    PRIVILEGES RELATING TO A SEARCH OF AN INMATE'S LEGAL MATERIAL

The attorney-client privilege protects (1) confidential communications between (2) a client (someone who is seeking legal services or advice) or his representative (3) and an attorney or the attorney's agent (for example, a secretary, paralegal, private investigator, or another attorney) (4) which is made for the purpose of facilitating the provision of legal services or advice.  There are situations where the privilege may be waived and no longer protects the communications.

There is also a privilege referred to as the attorney work-

1

product doctrine.  Attorney work product consists of material that reflects an attorney's efforts at investigating and preparing a case or the attorney's efforts in anticipation of litigation, including the attorney's (or that of the attorney's agent, working at the attorney's direction) pattern of investigation, assembling of information, determination of the relevant facts, preparation of legal theories, planning of strategy, and recording of mental impressions.

One exception to the attorney-client or work-product privileges where the privilege is waived is called the "crime-fraud" exception.  When the client uses the attorney-client relationship to engage in ongoing fraud rather than to defend against past misconduct, a privilege does not apply.  Thus, if a client communicated with an attorney seeking the attorney's help in facilitating a narcotics deal, that communication would not be privileged.  If, however, the client sought advice about defending against a past narcotics deal, or even the client's potential sentence for a current narcotics deal, that would be privileged because the attorney would not be helping the client commit the crime; the attorney would merely be giving advice concerning the client's legal problems.

C.  <u>REQUIRED READING</u>

Before you begin to search, you must read, be familiar with, and understand the contents of:

1. This memorandum;

2. The Affidavit of Special Agent Joshua Knapp in Support of the Application for Search Warrant; and

3. The Search Warrant and its attachments.

2

All of these documents will be provided to you before the
search begins.  Prior to searching, you must sign the attached
form indicating that you have read each of the above-listed
documents, are familiar with their contents, and will conduct the
search in accordance with the requirements and procedures set
forth in those materials.

D.   INSTRUCTIONS

1.   The search will be conducted by agents or other
personnel of the Bureau of Alcohol, Tobacco and Firearms.  The
searching agents have been selected in part because they will
have no further role in the investigation of this matter; under
no circumstances should the case agents view any documents that
may contain privileged information seized during the execution of
the warrant.

2.   The search is limited to the premises described in
Attachment A to the warrant.

3.   While the searching agent should collect any property
of the inmate marked as legal material, the searching agent <u>must
not</u> examine that material.  The searching agent must seal any
legal material and mark it as "potentially privileged."  All
sealed material is to be copied and the copies are to be returned
to the inmate.

4.   The searching agent should deliver the sealed items to
the prosecutor designated by the United States Attorney's Office
as the "privilege" Assistant United States Attorney ("AUSA") for
this search.  The privilege AUSA will be "walled off" from
subsequent participation in the investigation or prosecution of
the underlying matter.  The privilege AUSA shall not disclose the

3

1 contents of privileged material to the AUSAs and agents who are

2 investigating the matter, absent a court order.

3   5. The privilege AUSA will then be responsible for

4 forwarding the sealed items - without unsealing or reviewing the

5 items - to a court-appointed Special Master designated to conduct

6 a review of all items taken during the search that are

7 potentially subject to a claim of privilege.  If the Special

8 Master determines that material is either privileged or outside

9 the scope of the warrant, the material will be resealed and

10 returned to the search location.  This determination may include

11 a determination of whether the crime-fraud or another exception

12 to or waiver of the aforementioned privileges applies to an item.

13   6. The searching agents who have conducted a review of

14 potentially privileged material and the privilege AUSA shall be

15 ineligible for any subsequent participation in this investigation

16 and shall not disclose any privileged or potentially privileged

17 material to anyone not on the search team other than the

18 privilege AUSA and the Special Master, unless ordered by the

19 court.

20   7. Absent a court order, the Special Master shall not

21 disclose the contents of any privileged material to any agents or

22 AUSAs who are involved in the investigation.  The Special Master

23 may disclose privileged material to the privilege AUSA, and the

24 privilege AUSA may unseal and review any sealed portion of the

25 Special Master's report.  After any such review, the privilege

26 AUSA will reseal that portion of the report.

27 E. CONCLUSION

28   In order to avoid impinging on valid attorney-client

1  relationships, these guidelines take the least intrusive approach

2  consistent with the requirements of this investigation and

3  effective law enforcement.  These procedures are designed to

4  ensure that privileged materials are not improperly viewed,

5  seized, or retained during the course of the search and employ

6  precautions to ensure that the materials are reviewed for

7  privilege claims and that any privileged documents are returned.

8  This investigation depends on your adherence to the legal

9  requirements governing the execution of this search warrant,

10  searching the search location, handling seized items, and any

11  subsequent involvement in your role as a searching agent.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

1

<u>STATEMENT OF PARTICIPATING AGENTS</u>

2      I declare that I have read the following documents and am

3  familiar with their contents:

4      1.    Memorandum for Search of Inmate's Legal Material;

5      2.    Affidavit of Special Agent _____ (filed under seal);

6      3.    The search warrant and Attachments A and B.

7      I further declare that I will conduct the search in

8  accordance with the instructions set forth above.

9      DATED:    October ___, 2002.

10

11

12  _____
    Signature

13

14  _____
    Print Full Name

15

16  _____
    Agency

17

18

19

20

21

22

23

24

25

26

27

28

CR 02-938 DOC - 7/6/2006 - Day 46, Volume I

21

| | | |
|---|---|---|
| 10:21:10 | 1 | but the truth, so help you God? |
| 09:02:09 | 2 | THE WITNESS:  I do. |
| 09:02:09 | 3 | THE COURT:  Thank you, sir.  If you would retake |
| 09:02:12 | 4 | the witness stand.  And once again, would you state your |
| 09:02:15 | 5 | full name to the jury again and please spell your last name. |
| 09:02:18 | 6 | THE WITNESS:  Yes.  Okay.  Joshua George Knapp, |
| 09:02:29 | 7 | K-N-A-P-P. |
| 09:02:31 | 8 | THE COURT:  Thank you. |
| 09:02:31 | 9 | And, Counsel, direct examination, please. |
| 09:02:34 | 10 | MR. REED:  Thank you. |
| 09:02:34 | 11 | **DIRECT EXAMINATION** |
| 09:02:35 | 12 | BY MR. REED: |
| 09:02:35 | 13 | Q.    Mr. Knapp, you are employed by the Bureau of Prisons? |
| 09:02:38 | 14 | A.    No, sir, I'm not.  The Bureau of Alcohol, Tobacco, |
| 09:02:42 | 15 | Firearms and Explosives. |
| 09:02:43 | 16 | Q.    Okay.  Took you out of order.  Get my mind right. |
| 09:02:47 | 17 | You work for the ATF, and you are part of the Central |
| 09:02:51 | 18 | District of Illinois area? |
| 09:02:53 | 19 | A.    The Southern District of Illinois.  I work out of the |
| 09:02:56 | 20 | Fairview Heights field office. |
| 09:03:00 | 21 | Q.    On or about October 17th or so of 1992 -- excuse me -- |
| 09:03:04 | 22 | of 2002, you found yourself in the -- you were instructed to |
| 09:03:12 | 23 | conduct a search warrant of an investigation that you |
| 09:03:17 | 24 | actually did not participate in; is that correct? |
| 09:03:20 | 25 | A.    Yes. |



CR 02-938 DOC - 7/6/2006 - Day 46, Volume I

22

| | | |
|---|---|---|
| 09:03:24 | 1 | Q.   Do you know why it is that you were selected to do |
| 09:03:27 | 2 | that? |
| 09:03:27 | 3 | A.   Well, our field office falls within the Southern |
| 09:03:31 | 4 | District of Illinois.  The United States Penitentiary at |
| 09:03:34 | 5 | Marion, Illinois, also falls within the Southern District. |
| 09:03:38 | 6 | And my field office, my supervisor, received a call from the |
| 09:03:43 | 7 | Los Angeles division office stating that a number of search |
| 09:03:47 | 8 | warrants needed to be executed at this prison.  And being |
| 09:03:51 | 9 | one of the lower men on the totem pole, he came into my |
| 09:03:54 | 10 | office and said, "Go call Los Angeles about some search |
| 09:03:57 | 11 | warrants." |
| 09:04:00 | 12 | Q.   What, if anything, did you do next? |
| 09:04:02 | 13 | A.   Well, I called Los Angeles, found out there were |
| 09:04:05 | 14 | actually 17 search warrants to be executed and -- I believe |
| 09:04:10 | 15 | it was 17 -- and received some instructions from the case |
| 09:04:25 | 16 | agent, Mike Halualani, on how that was going to proceed. |
| 09:04:25 | 17 | Q.   Was Mr. Halualani present during the search? |
| 09:04:25 | 18 | A.   No, He was not. |
| 09:04:25 | 19 | Q.   Do you know why that was? |
| 09:04:28 | 20 | A.   I believe -- well, I know that there were -- |
| 09:04:30 | 21 | nationwide, I think there were 92 search warrants conducted |
| 09:04:35 | 22 | on that -- on the big day.  I think it was October 17th. |
| 09:04:39 | 23 | And he certainly couldn't be everywhere at once. |
| 09:04:43 | 24 | Q.   Okay.  Do you recall the day that the search was |
| 09:04:45 | 25 | conducted? |

CR 02-938 DOC - 7/6/2006 - Day 46, Volume I

23

| | | |
|---|---|---|
| 09:04:46 | 1 | A.   They were begun on October 17th, I think it was. |
| 09:04:49 | 2 | Q.   Do you recall the day that Mr. Sahakian's cell was |
| 09:04:52 | 3 | searched? |
| 09:04:53 | 4 | A.   No, I don't. |
| 09:04:56 | 5 | Q.   Were the actual searches conducted by you? |
| 09:05:00 | 6 | A.   I supervised them.  The Bureau of Prisons personnel |
| 09:05:04 | 7 | actually entered each of the cells and made -- and conducted |
| 09:05:09 | 8 | the searches. |
| 09:05:10 | 9 | Q.   Okay.  What does "supervise" mean? |
| 09:05:14 | 10 | A.   I was on the cellblock.  I conducted a briefing prior |
| 09:05:17 | 11 | to the execution of the search warrants.  I had read to them |
| 09:05:20 | 12 | from the affidavit the items to be seized.  And as I |
| 09:05:25 | 13 | mentioned in my previous testimony, in March, there were two |
| 09:05:30 | 14 | types of evidence that needed to be seized, and they had to |
| 09:05:33 | 15 | be collected very carefully. |
| 09:05:36 | 16 | Q.   You read the affidavit to them as opposed to letting |
| 09:05:40 | 17 | them read it themselves? |
| 09:05:42 | 18 | A.   I don't know if they all had copies of the affidavit |
| 09:05:44 | 19 | also.  But I believe there were at least 10 or 12 pages of |
| 09:05:49 | 20 | special instructions from this judicial district that needed |
| 09:05:52 | 21 | to be relayed to all the people involved in the searches. |
| 09:05:56 | 22 | Q.   Do you recall whether or not the instructions from the |
| 09:05:59 | 23 | Court indicated that these items were to be read by the |
| 09:06:03 | 24 | people conducting the search prior to doing the search? |
| 09:06:06 | 25 | A.   No, I don't recall that. |

CR 02-938 DOC - 7/6/2006 - Day 46, Volume I

24

| 09:06:07 | 1 | Q.   Okay.  Do you recall specifically whether or not you |
| 09:06:09 | 2 | read them the instructions or they read the instructions |
| 09:06:12 | 3 | themselves? |
| 09:06:12 | 4 | A.   No, I don't. |
| 09:06:13 | 5 | Q.   Okay.  Now, you said you were on the cellblock.  We've |
| 09:06:17 | 6 | had testimony previously as to roughly the size of a range. |
| 09:06:20 | 7 | So were you right there when the search was being conducted, |
| 09:06:22 | 8 | or were you somewhere on the same row? |
| 09:06:25 | 9 | A.   I was -- generally, there were only -- I don't think |
| 09:06:27 | 10 | there were more than two or three per block in terms of |
| 09:06:31 | 11 | cells that were searched.  So I was on the row, so to speak, |
| 09:06:35 | 12 | while the members of the Bureau of Prisons were inside the |
| 09:06:39 | 13 | cells themselves. |
| 09:06:40 | 14 | Q.   Okay.  So when you say "supervised," you mean that you |
| 09:06:44 | 15 | were on the same range where the searches were conducted, |
| 09:06:47 | 16 | but you were not personally observing the searches being |
| 09:06:51 | 17 | done themselves? |
| 09:06:52 | 18 | A.   I was walking up and down the row.  I could see the |
| 09:06:55 | 19 | Bureau of Prisons personnel members in the cells searching |
| 09:06:58 | 20 | through the inmates' items.  But was I standing next to each |
| 09:07:04 | 21 | one of the Bureau of Prisons personnel in each cell?  No, I |
| 09:07:07 | 22 | was not. |
| 09:07:08 | 23 | Q.   Okay.  Help me with this:  If there were, say, three |
| 09:07:13 | 24 | inmate cells to be searched on a particular range, all three |
| 09:07:18 | 25 | of those searches would be done at the same time? |

CR 02-938 DOC - 7/6/2006 - Day 46, Volume I

25

| | | |
|---|---|---|
| 09:07:21 | 1 | A.    Yes. |
| 09:07:22 | 2 | Q.    And you didn't go through and, say, search Cell A, and |
| 09:07:27 | 3 | then stop, then search Cell B, then stop, and then search |
| 09:07:32 | 4 | Cell C? |
| 09:07:33 | 5 | A.    No, I did not. |
| 09:07:34 | 6 | Q.    Okay.  Did you direct how the items were to be gathered |
| 09:07:42 | 7 | and put together? |
| 09:07:43 | 8 | A.    Yes, I did. |
| 09:07:43 | 9 | Q.    What did you tell them? |
| 09:07:45 | 10 | A.    I told them for the general items, I guess -- I'm not |
| 09:07:50 | 11 | sure how to describe them, but the things like photographs, |
| 09:07:55 | 12 | letters -- I'd say personal letters, address books, |
| 09:08:02 | 13 | pictures, that sort of thing, those would be considered |
| 09:08:06 | 14 | normal evidence that was to be collected in separate boxes. |
| 09:08:12 | 15 | This search warrant also requested that any -- anything |
| 09:08:16 | 16 | that had the appearance of looking like legal material was |
| 09:08:20 | 17 | to be separated out, placed in -- placed in separate boxes |
| 09:08:27 | 18 | during the search, and then those items were to be sealed |
| 09:08:31 | 19 | and sent out here to Los Angeles to be reviewed by a |
| 09:08:34 | 20 | previously designated special master by this judicial |
| 09:08:40 | 21 | district. |
| 09:08:41 | 22 | Q.    Okay.  Would you agree with me that you had never |
| 09:08:43 | 23 | conducted this type of search before? |
| 09:08:45 | 24 | A.    With those sorts of conditions, no, I had not. |
| 09:08:49 | 25 | Q.    Okay.  Now -- and you conducted a briefing of the |

CR 02-938 DOC - 7/6/2006 - Day 46, Volume I

26

| | | |
|---|---|---|
| 09:08:51 | 1 | people that were going to perform the search? |
| 09:08:53 | 2 | A.    Yes. |
| 09:08:54 | 3 | Q.    Now, let's say, for the sake of argument, I make myself |
| 09:09:00 | 4 | BOP employee "Joe Doe." And I ask you, "Well, what's legal? |
| 09:09:06 | 5 | How do I know what legal is?" What would you tell me during |
| 09:09:09 | 6 | that briefing? |
| 09:09:10 | 7 | A.    Well, I told them all -- it was to ground for me |
| 09:09:14 | 8 | also -- anything that had an attorney's name on it, anything |
| 09:09:18 | 9 | that had an attorney's stationery, and anything that in |
| 09:09:24 | 10 | their -- just their gut reaction was that it might even |
| 09:09:28 | 11 | potentially be legal material, to err on the side of |
| 09:09:33 | 12 | caution.  Those items needed to be placed in that box going |
| 09:09:36 | 13 | to the special master's office.  And then from there, that |
| 09:09:41 | 14 | person out here somewhere in Los Angeles -- in the |
| 09:09:44 | 15 | Los Angeles area, could make the determination if it was |
| 09:09:47 | 16 | truly privileged legal material or if it was deemed to be |
| 09:09:52 | 17 | criminal in nature.  And then from there, my understanding |
| 09:09:56 | 18 | was the truly privileged material would then be returned to |
| 09:10:00 | 19 | the inmate, and then anything that was deemed criminal in |
| 09:10:04 | 20 | nature, disguised as legal material, would then be forwarded |
| 09:10:09 | 21 | to the case agent for review in future criminal proceedings. |
| 09:10:13 | 22 | Q.    Well, let's say that, again, I'm Joe Doe, the BOP |
| 09:10:26 | 23 | employee.  If I asked you, "What would a personal letter |
| 09:10:26 | 24 | look like?" aside from the fact that you may stare at me |
| 09:10:26 | 25 | like I'm not particularly bright, how would you explain that |

*DEBBIE GALE, U.S. COURT REPORTER*

CR 02-938 DOC - 7/6/2006 - Day 46, Volume I

27

| 09:10:31 | 1 | answer? |
| 09:10:31 | 2 | A.    A personal letter, as in just, "Dear John," you know, |
| 09:10:35 | 3 | "How's prison?  Love mom"? |
| 09:10:38 | 4 | Q.    Yeah, like that. |
| 09:10:39 | 5 | A.    I think I would probably explain it that way. |
| 09:10:41 | 6 | Q.    Something in handwriting? |
| 09:10:43 | 7 | A.    Yeah. |
| 09:10:43 | 8 | Q.    Lawyers, would you agree, generally type things or at |
| 09:10:46 | 9 | least use a computer? |
| 09:10:47 | 10 | A.    Yes.  But I would say, though, I think the Bureau of |
| 09:10:48 | 11 | Prisons personnel generally -- I think that they do conduct |
| 09:10:52 | 12 | many searches of prisoners' cells.  I did notice that a lot |
| 09:10:56 | 13 | of the -- that the guards were reading some of the |
| 09:11:01 | 14 | materials, I think, to try to make that determination if it |
| 09:11:03 | 15 | was going to be truly a personal letter or at least what |
| 09:11:07 | 16 | they thought would be a personal letter versus some sort of |
| 09:11:11 | 17 | legal correspondence. |
| 09:11:13 | 18 | And I guess -- I would hope that if an attorney did |
| 09:11:16 | 19 | actually handwrite a note, that they would see that, and if |
| 09:11:20 | 20 | the attorney signed it, you know, "Truly, from your |
| 09:11:24 | 21 | attorney," or something along those lines, then they would |
| 09:11:26 | 22 | make that determination and put it into the legal box. |
| 09:11:29 | 23 | Q.    During your perusing up and down the range -- and we're |
| 09:11:32 | 24 | using three; it may not have been three -- but of the three |
| 09:11:36 | 25 | searches that were going on simultaneously, your |

*DEBBIE GALE, U.S. COURT REPORTER*

CR 02-938 DOC - 7/6/2006 - Day 46, Volume I

28

| | | |
|---|---|---|
| 09:11:38 | 1 | understanding was that the BOP employees conducting the |
| 09:11:41 | 2 | search were reviewing, right? -- actually reading the |
| 09:11:46 | 3 | documents or in an attempt to glean which stack they fell |
| 09:11:50 | 4 | into? |
| 09:11:50 | 5 | A.    Yes.  I don't see how they could have done it any other |
| 09:11:53 | 6 | way. |
| 09:11:54 | 7 | Q.    Okay.  Now, what happened after all three were done -- |
| 09:11:57 | 8 | all three searches were done?  And I'm specifically talking |
| 09:12:00 | 9 | about Mr. Sahakian, 'cause that's the one you testified on |
| 09:12:04 | 10 | way back when, on the -- |
| 09:12:07 | 11 | A.    March something or other. |
| 09:12:08 | 12 | Q.    -- March 17th, 2006. |
| 09:12:10 | 13 | What did you do once the items were boxed up? |
| 09:12:16 | 14 | A.    Well, I labeled on the side -- I think that was also in |
| 09:12:19 | 15 | the instructions.  I think it had to be clearly labeled on |
| 09:12:24 | 16 | the outside of each box -- and I think I used a large Magic |
| 09:12:29 | 17 | Marker, "Potentially Privileged Legal Material."  And those |
| 09:12:35 | 18 | boxes were sealed, I guess -- I don't remember exactly what |
| 09:12:39 | 19 | I used -- I assume packing tape, because I knew they were |
| 09:12:44 | 20 | going to be transported via Federal Express out here.  All |
| 09:12:49 | 21 | those boxes were secured at the prison, itself, in -- I'm |
| 09:12:51 | 22 | not sure.  I don't remember where it was exactly, but they |
| 09:12:54 | 23 | were secured in a locked storage area. |
| 09:13:00 | 24 | Q.    Do you recall testifying on the 17th of March 2006, |
| 09:13:05 | 25 | that you coordinated, basically, making sure that all the |

*DEBBIE GALE, U.S. COURT REPORTER*

CR 02-938 DOC - 7/6/2006 - Day 46, Volume I

29

| | | |
|---|---|---|
| 09:13:08 | 1 | cells were searched and then took control of the boxes? |
| 09:13:12 | 2 | A.   Yes. |
| 09:13:13 | 3 | Q.   If the boxes were taken to another -- an office in the |
| 09:13:18 | 4 | BOP and locked, did you stay with those boxes during that |
| 09:13:22 | 5 | period of time?  What do you mean, "took control of the |
| 09:13:24 | 6 | boxes"? |
| 09:13:25 | 7 | A.   Well, I removed them under the direction of the Bureau |
| 09:13:28 | 8 | of Prisons and placed them in what they described to me as a |
| 09:13:32 | 9 | secure storage location.  We had to wait until Mike |
| 09:13:35 | 10 | Halualani, who's the ATF case agent, and another ATF agent, |
| 09:13:39 | 11 | whose name I don't recall, arrived in Marion.  They were |
| 09:13:44 | 12 | going to review all of the non-potentially privileged legal |
| 09:13:50 | 13 | material to make sure that things that weren't essential to |
| 09:13:57 | 14 | the case were not -- how do I describe this -- just to make |
| 09:14:02 | 15 | sure that only the necessary items were removed from the |
| 09:14:06 | 16 | prison and from the inmates. |
| 09:14:07 | 17 | He also brought me shipping information to be able to |
| 09:14:10 | 18 | make sure that all the boxes were properly shipped to the |
| 09:14:14 | 19 | special master out here in Los Angeles.  And the regular |
| 09:14:17 | 20 | evidence items were sent to the ATF office. |
| 09:14:20 | 21 | Q.   If you -- let me get my head around this for a second. |
| 09:14:23 | 22 | All of the items from Mr. Sahakian's cell are loaded on |
| 09:14:28 | 23 | a pallet, some type of movable vehicle, and then they are |
| 09:14:32 | 24 | put in this secure area? |
| 09:14:36 | 25 | A.   Yes. |

*DEBBIE GALE, U.S. COURT REPORTER*

CR 02-938 DOC - 7/6/2006 - Day 46, Volume I

30

| | | |
|---|---|---|
| 09:14:36 | 1 | Q.   So -- all of the boxes; is that correct? |
| 09:14:39 | 2 | A.   I think so, yeah. |
| 09:14:40 | 3 | Q.   All right.  Then Agent Halualani, who is from |
| 09:14:43 | 4 | Los Angeles -- |
| 09:14:44 | 5 | A.   Uh-huh. |
| 09:14:44 | 6 | Q.   -- flies to Marion -- |
| 09:14:46 | 7 | A.   Or flies to St. Louis. |
| 09:14:47 | 8 | Q.   Flies to St. Louis? |
| 09:14:49 | 9 | A.   Yes. |
| 09:14:50 | 10 | Q.   Picks you up? |
| 09:14:50 | 11 | A.   Actually, he followed me down there.  It's quite a long |
| 09:14:54 | 12 | drive. |
| 09:14:54 | 13 | Q.   Yes, it is.  Painfully long. |
| 09:14:57 | 14 | Then you and Agent Halualani -- strike that. |
| 09:15:03 | 15 | Agent Halualani then reviews the boxes, the nonlegal boxes |
| 09:15:08 | 16 | from the legal boxes? |
| 09:15:09 | 17 | A.   Yes. |
| 09:15:11 | 18 | Q.   But previously the person doing the cell search, |
| 09:15:14 | 19 | whoever that may be, he designated nonlegal versus legal; is |
| 09:15:19 | 20 | that correct? |
| 09:15:20 | 21 | A.   Yes. |
| 09:15:21 | 22 | Q.   Then Agent Halualani does what again? |
| 09:15:24 | 23 | A.   He looks through the boxes that were not deemed to be |
| 09:15:28 | 24 | potentially privileged legal material and -- just to make |
| 09:15:33 | 25 | sure -- I think just to make sure that the items that the |

CR 02-938 DOC - 7/6/2006 - Day 46, Volume I

31

| | | |
|---|---|---|
| 09:15:38 | 1 | guards had taken were something that he wanted to be kept |
| 09:15:42 | 2 | and brought back to Los Angeles. |
| 09:15:44 | 3 | Q.   Okay.  Now, think back to the -- and, by the way, |
| 09:15:47 | 4 | assume for the fact -- for sake of argument that this |
| 09:15:50 | 5 | occurred on the 22nd of October 2002. |
| 09:15:53 | 6 | A.   What did? |
| 09:15:54 | 7 | Q.   The search. |
| 09:15:55 | 8 | A.   Okay. |
| 09:15:55 | 9 | Q.   Okay.  On the 22nd, items from Mr. Sahakian's cell are |
| 09:16:11 | 10 | taken out of his cell and put in the boxes and then shipping |
| 09:16:11 | 11 | tape is put around the boxes.  Is that what you said? |
| 09:16:11 | 12 | A.   Actually -- well, yes, initially, yes.  Mr. -- it's -- |
| 09:16:12 | 13 | unfortunately, it's probably a little bit longer answer than |
| 09:16:16 | 14 | you're looking for.  Is that all right? |
| 09:16:17 | 15 | Q.   Yeah, sure. |
| 09:16:18 | 16 | A.   Okay.  Mr. Sahakian's situation was unique because he |
| 09:16:24 | 17 | and two other inmates were -- had a pending capital case in |
| 09:16:29 | 18 | the Southern District of Illinois.  And the district court |
| 09:16:33 | 19 | judge there, his condition for allowing the searches to be |
| 09:16:38 | 20 | conducted were that Mr. Sahakian's potentially privileged |
| 09:16:47 | 21 | legal material -- and there were two other defendants in |
| 09:16:51 | 22 | that case, in the Southern District -- all of that material |
| 09:16:54 | 23 | had to be photocopied prior to it -- to be allowed -- for it |
| 09:17:00 | 24 | to be allowed to leave the district, because they were |
| 09:17:04 | 25 | both -- or, excuse me -- all three of them were |

*DEBBIE GALE, U.S. COURT REPORTER*

6

```
 1      SANTA ANA, CALIFORNIA; THURSDAY, JULY 6, 2006; 1:15 P.M.

 2

 3          (The following were had in open court in the

 4      presence of the jury:)

 5              THE COURT:  We're back.  We're on the record.

 6              The jury is present, the alternates are present,

 7      all counsel, the defendants, defense counsel, the

 8      government.

 9              Mr. Reed, would you like to call your next

10      witness, please.

11              DEFENDANT GIBSON:  He is getting him, your Honor.

12              THE COURT:  Thank you.

13          (Pause.)

14              THE COURT:  Thank you.  Would you be kind enough

15      to raise your right hand, please.

16              BYRON TOLSON, DEFENDANT'S WITNESS, SWORN

17              THE WITNESS:  Yes.

18              THE COURT:  Thank you.  Would you please be

19      reseated in the witness box.  And I believe we've previously

20      sworn you.  Regardless, would you restate your name to the

21      jury.  And after you're comfortably seated, then, would you

22      spell your last name.

23              THE WITNESS:  Yes.  Byron Tolson, T-O-L-S-O-N.

24              THE COURT:  Thank you.

25              And this would be direct examination by Mr. Reed
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*



Exh.3

7

1    on behalf of Mr. Gibson.

2              MR. REED:  Thank you.

3                        DIRECT EXAMINATION

4    BY MR. REED:

5    Q.    Mr. Tolson, you are currently a Bureau of Prisons

6    employee; is that correct?

7    A.    Yes, sir.

8    Q.    And you currently work at Marion USP?

9    A.    Yes.

10   Q.    And have you worked at any other USPs other than

11   Marion?

12   A.    USP Terre Haute.

13   Q.    Okay.  On the 22nd of October, 2002, you actually

14   conducted the cell search of David Sahakian; is that

15   correct?

16   A.    Yes.

17   Q.    And you're positive it was the 22nd?

18   A.    October 22nd, 2002.  Yes, sir.

19   Q.    Okay.  Not the 17th?

20   A.    Correct.

21   Q.    All right.  Safety and security of the institution is

22   the mantra of the Bureau of Prisons; is that correct?

23   A.    Yes.

24   Q.    All right.  Now, that particular cell search was

25   conducted pursuant to a court order -- well, ultimately a

*DEBORAH D. PARKER, U.S. COURT REPORTER*

8

1    search warrant and a court order; is that correct?

2    A.    Yes.

3    Q.    How -- what was your understanding of the court order?

4    A.    That all legal material, written documentation,

5    magazines, photo albums, address books, things of this

6    nature would be -- would be taken during the search.

7    Q.    And you were David Sahakian's counselor, or at least --

8    A.    Not at that time, sir, but I am now.

9    Q.    Okay.  And what was -- what was your assignment at that

10   time back in 2002?

11   A.    I was a counselor back then, but he was not on my

12   caseload.

13   Q.    But you knew who he was in 2002?

14   A.    Yes.

15   Q.    And did you know he was designated to be a member of a

16   disruptive group known as the Aryan Brotherhood?

17   A.    Yes.

18   Q.    Now back in 1999 -- or back in 2002, were you aware

19   that Mr. Sahakian had a federal case pending or at least

20   still in the -- I think it was still going on at the time of

21   the search?

22   A.    Yes.

23   Q.    Okay.  Do you know what that case was about?

24   A.    Yes.

25   Q.    Did you know that Mr. Sahakian had a case in 1999 that

*DEBORAH D. PARKER, U.S. COURT REPORTER*

9

1    had to do with a -- I think Mitch Kole was one of the

2    co-defendants -- Kole, K-O-L-E.  Mitch Kole was one of the

3    co-defendants in that case and had to do with having a knife

4    secreted on his body?

5    A.    I'm aware of that.

6    Q.    You're aware of that case as well?

7    A.    Yes.

8    Q.    Do you know if Mr. Sahakian's cell was searched in

9    conjunction with that 1999 case?

10   A.    No, I don't.  I would assume it was, though.

11   Q.    Okay.  That seems like something that would be

12   consistent with the way things are done at the BOP?

13   A.    Yes.

14   Q.    Is that correct?

15   A.    Yes.

16   Q.    And then there was an indictment on the case that was

17   pending for Mr. Sahakian, the one in 2000 where he was tried

18   in Benton, Illinois; is that correct?

19   A.    I don't know the actual time frame, but I was aware of

20   that, yes.

21   Q.    Okay.  But it's not the case we are talking about right

22   now which is basically here in California?

23   A.    Correct.

24   Q.    All right.  The court order, I think it was Judge

25   Frazier out there, that basically let down -- set down the

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10

1  guidelines of how he wanted that search to be done; is that

2  correct?

3  A.    I'm not sure about that.

4  Q.    As to who the judge was or?

5  A.    Right.

6  Q.    Well, forget that then.

7         You understood that a federal court judge set down

8  the guidelines on how he wanted the search done?

9  A.    Yes.

10  Q.   How was that communicated to you?

11  A.   We had a meeting in the lieutenant's office and given a

12  briefing.

13  Q.   Who was present at that meeting?

14  A.   Well, I can only be certain that myself and Rick Ellet

15  and I think Lieutenant Bloodworth and possibly Dave Null of

16  the SIS, too.  We did the videotape.

17  Q.   What about the ATF agent?

18  A.   I can't be certain if he was at the briefing.

19  Q.   Do you know if he conducted the briefing?

20  A.   I don't remember.

21  Q.   How were you made aware of the parameters that were to

22  be followed with regard to the search?

23  A.   During this briefing a lieutenant pretty much told us

24  what we needed to do.

25  Q.   Did you also read the court order?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

11

1   A.   No, I did not.

2   Q.   Now, have you conducted cell searches in the past?

3   A.   Yes, sir.

4   Q.   Approximately how many up to that point on

5   October 22nd, 2002?

6   A.   Too many to count.  They were required on a daily basis

7   as an officer, you know.  Minimum five a day.

8   Q.   Of any inmate?  Or how does that work?

9   A.   Randomly.  Yes.

10  Q.   And I think, correct me if I'm wrong, that the policy

11  of the Bureau of Prisons is that cell searches are -- cell

12  searches of inmates' cells are to be done routinely and

13  irregularly?

14  A.   Correct.

15  Q.   So you don't want the guys to know that you guys are

16  searching; is that correct?

17  A.   Yes.

18  Q.   So on occasion they're done while the inmate is there.

19  Maybe pull him out and put him in another cell.  Is that one

20  way to do it?

21  A.   Yes.

22  Q.   And then you might also do it when the inmate is out to

23  rec; is that right?

24  A.   Yes.

25  Q.   Would it be a fair statement for me to state that for

*DEBORAH D. PARKER, U.S. COURT REPORTER*

32

1            THE COURT:  Thank you, sir.  If you would be kind

2    enough to step forward between the double doors.  Now would

3    you raise your right hand, sir.

4            RICK ELLET, DEFENDANT'S WITNESS, SWORN

5            THE WITNESS:  I do.

6            THE COURT:  Thank you, sir.  If you would please

7    be seated in the witness box which is just to my right and

8    your left.  After you're seated, sir, would you state your

9    name to the jury, please.

10           THE WITNESS:  Rick Ellet.

11           THE COURT:  Would you spell your last name for the

12   jurors?

13           THE WITNESS:  E-L-L-E-T.

14           THE COURT:  E-L-L-E-T?

15           THE WITNESS:  Yes, sir.

16           THE COURT:  Thank you very much.

17           And counsel, this would be direct examination by

18   Mr. Reed, representing Mr. Gibson.

19           MR. REED:  Thank you.

20                   DIRECT EXAMINATION

21   BY MR. REED:

22   Q.   Mr. Ellet, you are retired from the Bureau of Prisons;

23   is that correct, sir?

24   A.   Yes, sir.

25   Q.   Okay.  But prior to retiring, you worked in the BOP at

*DEBORAH D. PARKER, U.S. COURT REPORTER*

Exh. 4



33

1    Marion?

2    A.   Yes, sir.

3    Q.   Approximately how long did you work there?

4    A.   A little over 20 years.

5    Q.   Okay.  Did you just retire this last year?

6    A.   No.  2000 -- New Year's Eve 2003.

7    Q.   So you were there way back, back in the '80s?

8    A.   Yes, sir.

9    Q.   Okay.  Now, did you have occasion to conduct a cell

10   search of David Sahakian along with Mr. Tolson over there on

11   October 22nd, 2002?

12   A.   Yes.

13   Q.   And I think if you turn around, although you can't see

14   which one of you it is, I think one of those two fellows is

15   you.  Can you tell yourself?

16   A.   I suppose it is, but I can't tell from that view.

17   Q.   Let me give you a better shot.

18        (Laughter.)

19            THE WITNESS:  That looks like me, yes.

20   BY MR. REED:

21   Q.   Which one?

22   A.   The guy with the glasses on there.

23   Q.   Okay.  How was it that you ended up doing the cell

24   search of Mr. Sahakian?  Was that your assignment that day?

25   A.   It would have to had been or I wouldn't be doing it.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

34

1  Q.   I understand that.  But I mean, you were assigned to do

2  cell searches that day, or what was your normal assignment,

3  say, the day before that?

4  A.   As far as that particular day, there is no way in the

5  world I could recall that, sir --

6  Q.   Okay.

7  A.   -- for the whole day, as far as that goes.

8  Q.   Okay.  Do you know Mr. Sahakian?

9  A.   Yes.

10  Q.   Did you know him back then?

11  A.   Oh, yeah.

12  Q.   All right.  You guys had had dealings with each other

13  in the past?

14  A.   Oh, yeah.

15  Q.   All right.  Now, did you work for SIS at that time?

16  A.   At that particular time, I think I had just started

17  working in the SIS at that particular time.  I was still in

18  a correctional officer's uniform.  But shortly thereafter, I

19  think I went to civilian clothes or whatever.  I believe I

20  was during that particular shakedown, yes.

21  Q.   SIS, they wear civilian clothes?

22  A.   Yes.  For the most part, yes.

23  Q.   Shirt and --

24  A.   Shirt and tie.  Kind of like what I got, yes.

25  Q.   Okay.  So they still wear a tie.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

35

1    A.    As far as I know.

2    Q.    I don't mean right now.  I mean back then.  They

3    don't --

4    A.    Yes.  Yes.

5    Q.    You're going to get me in trouble.  You got to wait

6    till I finish, then you answer, then I'll wait till you

7    finish.

8    A.    Sorry.

9    Q.    The regular correctional officer's uniform is a white

10   shirt, gray pants and a version of a red tie.

11   A.    Just what you see on the screen there, yes, sir.

12   Q.    SIS uniform is I guess a variation of the shirt, but

13   there's also a tie?

14   A.    It depends on your particular assignment.  If you're

15   assigned down there permanently, for a period of time they

16   may give you an option.  You don't have to wear your

17   uniform.  You can wear civilian clothes if you choose.  It

18   was kind of one of those situations.

19   Q.    Okay.  And you were selected by someone or told by

20   someone that you needed to report down and whatever cell

21   range Mr. Sahakian's cell was on and to assist Mr. Tolson in

22   that search?

23   A.    Yes.

24   Q.    And that would have been by someone that was superior

25   to you, I take it?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1  A.   Yes, sir.

2  Q.   Okay.  Now, during the entire time that you have known

3  Mr. Sahakian, he has been an inmate in federal prison; is

4  that correct?

5  A.   Yes.

6  Q.   And he's still an inmate in federal prison, although

7  you may or may --

8  A.   I guess.

9  Q.   Now, did you have occasion to ever see Mr. Sahakian in

10  a different setting other than federal prison?

11  A.   Court case.

12  Q.   That would be the case in Benton, Illinois; is that

13  correct?

14  A.   Yes, sir.

15  Q.   I think Mr. Daugherty filed a civil suit against you

16  and a couple of other people from the Bureau of Prisons --

17  A.   Yes.

18  Q.   -- at Marion --

19  A.   Yes.

20  Q.   -- is that correct?

21       And you remember seeing Mr. Sahakian because he

22  testified in that case; is that correct?

23  A.   Absolutely, yes.

24  Q.   Do you remember what the outcome of that case was with

25  regard to you and I think it was a captain?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    A.    Yes.

2    Q.    What was that, sir?

3    A.    We lost.

4    Q.    Okay.  You were found liable?

5    A.    Yes, sir.

6    Q.    Civil Rights violation, was it not?

7    A.    Yes.

8    Q.    That happened around about 1996; is that correct?

9    A.    Pretty much, yes.

10    Q.    Dave Sahakian testified against you in 1996?

11    A.    Yes.

12    Q.    Your superior captain or lieutenant in 2002 tells you

13    to go down and do the Dave Sahakian search; is that right?

14    A.    I don't recall who told me, but a supervisor, yes.

15    Q.    Someone above you?

16    A.    Right.

17    Q.    You were working at SIS at the time or at least

18    directly after that?

19    A.    I believe so, yes.

20    Q.    Is that right?

21    A.    I believe so, yes.

22    Q.    Do you know what those documents -- where those boxes

23    went to after you guys did that search?

24    A.    To the best of my memory, they were stored in the SIS

25    office in a storage area behind a steel door, as best I can

*DEBORAH D. PARKER, U.S. COURT REPORTER*

38

1    recall.

2    Q.    Inmates have access to those steel doors?

3    A.    No.

4    Q.    Who would have access to those steel doors?

5    A.    My supervisor.

6    Q.    So that's a BOP employee?

7    A.    Yes.

8    Q.    What about the regular SIS people?

9    A.    Those too.

10    Q.    Those --

11    A.    Myself included at that time, if I worked down there,

12    which I'm sure that I did.

13    Q.    The SIS folks, those are the investigative agency --

14    that's the investigative arm of the BOP; is that right?

15    A.    Yes.    Right.

16    Q.    Were you briefed by a lieutenant or someone above you

17    as to what the limitations of the search were going to be?

18    A.    We were told, as best I can recall, just to take

19    everything and box it up.    Everything.

20    Q.    Didn't have to look at it at all, you just boxed it all

21    up.

22    A.    All we did was box it up.

23    Q.    No designation of legal versus nonlegal?

24    A.    No.    It was -- what happened was they boxed up, took it

25    to a secure area and inventoried it, and went through it

*DEBORAH D. PARKER, U.S. COURT REPORTER*

39

1    piece by piece.  We just got it out of the particular cell

2    block and took it down to the storage area where they

3    started going through it.

4    Q.    Okay.  You guys boxed it up and when you boxed it up

5    somebody put wrapping tape on it; is that right?

6    A.    Uh-huh.

7    Q.    You're nodding saying "yes"?

8    A.    Yes.

9    Q.    And then it's taken to a secure area inside the prison;

10   is that correct?

11   A.    Well, you're kind of out of sequence there.  You're

12   confusing me now.

13        What we did was box it up from the cell.  Took it

14   down to the storage area.  They went down and -- or whoever,

15   I don't know who, or some -- whoever was involved in

16   searching it went through it piece by piece inventorying it,

17   then taped it all closed and put it up.  So --

18   Q.    So it wasn't taped by you guys at the cell?

19   A.    No.  No.  As best I can recall, I don't think so.

20   Q.    Let's do this.  Let's speed up a little bit.

21        Now we don't hear the sound, but you guys are

22   actually talking; is that correct?

23   A.    It looks like it.

24   Q.    Okay.  Who is that guy there with the nonwhite shirt

25   on?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

40

1    A.    That's Mr. Dave Null.  He worked in that office in the

2    SIS office also as a technician.

3        (Pause.)

4    BY MR. REED:

5    Q.    What's going on right there?

6    A.    Well, it looks like we're getting ready to tape it up.

7    Q.    Is that video consistent with your recollection?

8    A.    Yes.

9    Q.    Okay.  And looks like that box right there has got tape

10   on it.  The box Mr. Null is writing on?

11   A.    We always taped the bottoms of them up so that the

12   documents wouldn't fall out the bottom because they're

13   heavy.  So I know we always do the bottoms, but I wasn't

14   aware that we did the tops of them on the tier like that.

15   Q.    Okay.

16   A.    Maybe we did.

17   Q.    It's got about four minutes and 32 seconds to go or 38

18   seconds to go.

19         What's that guy doing right there?

20   A.    He's taping a box up, sir.

21   Q.    Okay, sir.  So we'd agree that the boxes were taped

22   while you were there?

23   A.    The tape doesn't lie, sir.  Yes, sir.

24   Q.    Looks like to me you guys are doing every one of those

25   boxes; is that right?

41

1   A.   Yes, sir.

2   Q.   Okay.  That's the end of that search.  And I think you

3   two might have gone on and done some searches some other

4   place; is that correct?

5   A.   Possibly.

6   Q.   Let me -- let me recap.  You do the cell search.  Now

7   we know you taped the boxes up while you are still outside

8   of Mr. Sahakian's cell.  It's your understanding that all of

9   those boxes are then taken to a secure place and then

10  someone goes through them page by page.  Who did that?

11  A.   I don't know.

12  Q.   Was it a BOP employee?

13  A.   Yes, sir.

14  Q.   Was it somebody at SIS?

15  A.   More than likely.  It may have been me, but I just

16  don't recall if I went through that particular boxes or not.

17  I know I helped on a few of those, but I don't know if I did

18  this one or not.

19  Q.   Okay.  So if logic would follow, if you sealed the

20  boxes while they were still outside the cell, when you take

21  them to the secure place somebody has to unseal them and

22  take the tape off or cut through the tape?

23  A.   Yes.

24  Q.   And then go through the boxes; is that correct?

25  A.   Yes.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

42

1   Q.   And reseal it again?

2   A.   Yes.

3   Q.   Do you know whether or not anybody ever copied the

4   documents that were in those boxes?

5   A.   No, I don't.

6   Q.   Your recollection is that you went through all the

7   boxes.  Or someone.  You may have been involved, but you

8   don't remember?

9   A.   Don't remember.

10  Q.   Went through the boxes and went page by page as to what

11  was in there; is that correct?

12  A.   Yes.  But I'm not really sure if it's BOP or the agency

13  that came to -- with the search warrant.  I'm thinking it

14  was another agency involved during that particular search.

15  I don't know if they went through it or if it was BOP

16  person.  I really don't remember.

17  Q.   But you do recall it was page by page?

18  A.   Not really, because I wasn't there.  Best I can

19  remember.

20  Q.   Well, a couple of seconds ago or minutes or so, you

21  testified it was page by page.  Did you do that just

22  haphazardly?

23  A.   I'm saying under normal circumstances if I would have

24  had any dealings with it and I was told go through it page

25  by page, yes, I really would have.  But in that particular

*DEBORAH D. PARKER, U.S. COURT REPORTER*

43

1   case, I assume somebody did.  I don't know if it was me or

2   somebody else.  I really don't know.  I can't remember.

3   Q.    Did you fill out an Inmate Personal Property Report

4   based upon the search on the 22nd?

5   A.    I believe on the video there I remember signing a

6   couple of property forms, yes, sir.

7   Q.    And what are those forms for?

8   A.    Tracking inmate personal property and having a record

9   of it basically.

10   Q.    You see contraband, do you make a note of the

11   contraband?

12   A.    Oh, yeah.

13   Q.    What would be contraband?

14   A.    Basically two types.  Depends on what you're looking

15   for; hard contraband or nuisance contraband.  Could be a

16   weapon, drugs, something like that, or it could be something

17   that's just nuisance, too many magazines, too many

18   toothbrushes, you know, something like that.  Could be

19   anything.

20   Q.    Safety and security of the institution?

21   A.    Safety and security of the institution, yes, sir.

22   Q.    Not custody.

23   A.    Yes.

24   Q.    You take a look at that document in front of you,

25   Exhibit 258, it's a loose piece of paper.  Other side.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1   A.    This one?

2   Q.    Yes.

3   A.    This one right here?

4   Q.    The next one.

5           Put on your hat back when you were still a BOP

6   employee, take a quick scan of that and look at it, and tell

7   me what you'd do if you saw that document.

8   A.    Well, what I would do with it is turn it over to the --

9   someone to investigate it because for security purposes.

10  Q.    Why is that?

11  A.    Well, it contains what I would consider to be

12  gang-related information possibly.  Just after -- you know,

13  from a glance.

14  Q.    Okay.

15  A.    And I would definitely turn it over to a supervisor

16  because it's a point of interest.

17  Q.    Okay.  And you'd make note of the fact that you saw

18  that?

19  A.    Yeah.  If I went through it page by page, absolutely.

20  If I found that, I would turn it over to someone, yes.

21  Q.    Why don't you turn to, in that book there,

22  Exhibit 4062.

23  A.    40 -- okay.

24  Q.    And if you turn to the next page in that same exhibit,

25  or I think the third page, you'll see what appears to be

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    your name.

2    A.    Yes, sir.

3    Q.    Do you know your handwriting when you see it?

4    A.    Yes, sir.

5    Q.    Does it look like the two previous pages of 4062, the

6    ones that do not possess your name?  Looks like that you're

7    the person that wrote this up.

8    A.    Yes.  I cosigned it with another officer, yes.

9    Q.    That would be Tolson who just left here a second ago?

10    A.    Yes.

11    Q.    Now, did you understand that the trial judge, when he

12    made his order, set forth exactly how the search was to be

13    done and who was to do it?

14    A.    I have no knowledge of that.

15    Q.    Were you ever told to familiarize yourself with the

16    contents of the judge's memorandum telling you how the

17    search should be done?

18    A.    I have no recollection of that whatsoever.

19    Q.    Do you know if you were told by the lieutenant or

20    whoever it was that explained to you what the search should

21    be that it was to be conducted consistent with the court

22    orders of a judge?

23    A.    The only thing that I can remember, sir, is that we

24    were told to grab everything in the cell and box it up.

25    That's basically all I can recall.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

46

1   Q.   If you turn to 4064, turn to the fourth page.

2   A.   *(Witness so complies.)*

3   Q.   Have you ever seen this document?  I think fourth page

4   starts "Schedule One."

5          THE COURT:  Not page four, but the fourth page in,

6   counsel?

7          MR. REED:  Yes.

8   BY MR. REED:

9   Q.   Fourth page in.

10  A.   It says "Schedule One" at the top of the page?

11  Q.   Had you ever seen this document prior to doing the

12  search?

13  A.   No, sir.  Not that I can recall.

14  Q.   If you turn back two previous pages to the second page

15  where it states "Order."

16  A.   Yes.

17  Q.   Have you ever seen this document?

18  A.   Not that I recall.

19  Q.   Okay.  Now, that judgment that you had against you,

20  Mr. Sahakian testified Mr. Daugherty sued you.  That was

21  over at Benton, Illinois court; isn't that right?

22         The judgment that you had against you, the civil

23  judgment, that was Mr. Sahakian testified wherein

24  Mr. Daugherty sued you, you and a couple other people, that

25  was in a jury trial; is that correct?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

47

```
 1    A.    Yes.
 2    Q.    Some jurors had made findings?
 3    A.    Yes.
 4    Q.    And the lawsuit against you had to do with falsifying
 5    an incident report; is that correct?
 6    A.    That's what they said, yes.
 7    Q.    That's what you were found liable for; is that right?
 8    A.    Yes.
 9    Q.    Thank you.
10          MR. REED:  I have no further questions, your
11    Honor.
12          THE COURT:  Questions on -- I designate this
13    direct examination, Mr. Fleming?
14          MR. FLEMING:  Yes, your Honor.
15          THE COURT:  Questions on direct examination?
16          MR. FLEMING:  No questions.
17          THE COURT:  Mr. White or Mr. Harris, questions on
18    direct examination?
19          MR. WHITE:  No, your Honor.
20          THE COURT:  Mr. Calabria, Mr. Rosen, questions on
21    direct examination?
22          MR. CALABRIA:  No, your Honor.
23          THE COURT:  Government, do you have questions on
24    cross-examination?
25          MS. FLYNN:  Yes, your Honor.
```

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1          THE COURT:   This would be Ms. Flynn.

2                      CROSS-EXAMINATION

3    BY MS. FLYNN:

4    Q.   Mr. Ellet, do you remember if the search that was

5    conducted on 10/22nd -- or October 22nd, 2002, was a normal

6    type of search that you do under -- in the BOP?

7    A.   It was generally conducted like most of them were.  If

8    you confiscate an inmate's property, it was routine to box

9    everything up if they were going to segregation or whatever.

10   It's pretty much conducted like most of them are.

11   Q.   Do you remember if there were additional special

12   measures put in place on October 22nd, 2002?

13   A.   Other than securing the property in the SIS office

14   behind the steel door, the best of my memory that's pretty

15   much it, that I can remember.

16   Q.   Okay.  Do you have a fairly clear recollection of

17   October 22nd, 2002?

18   A.   No.

19   Q.   As you testify here today, it seems that your memory is

20   kind of hazy of those events?

21   A.   Yeah.  It's be a long time ago.

22   Q.   As a BOP officer, how often did you search inmate

23   cells?

24   A.   I can't count -- I can't count the times, been that

25   numerous.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

49

1  Q.   And in 2002, how long had you been with the BOP at that

2  time?

3  A.   Almost 20 years.

4  Q.   And are you getting -- or can you clearly recollect

5  searching Mr. Sahakian's cell pursuant to a search warrant

6  on October 22nd, 2002?

7  A.   If I hadn't seen the video, I wouldn't had -- I mean, I

8  know that it happened, but as far as the date and when and

9  whatnot, just like securing the boxes with the tape, there's

10 no way I would have remembered that.  I probably should have

11 said I just didn't know.

12 Q.   And you weren't responsible for what happened to the

13 boxes after they were taped up as you saw on the video, as

14 far as you can remember?

15 A.   No.

16 Q.   So you don't know what happened to them when they were

17 removed -- or you can't remember what happened to them when

18 they were removed from the area on the 22nd?

19 A.   Took them to storage area, SIS area, locked the door.

20 That's it.  That's all I remember.

21 Q.   So you don't know if somebody came in there pursuant to

22 orders of a district court judge and copied all of the

23 documents?

24 A.   I have no way of knowing that and no idea.  No

25 recollection.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1    Q.   And you don't know if special agents with the ATF went

2    through nonprivileged materials?

3    A.   I have no idea.

4    Q.   You don't know if the potentially privileged legal

5    materials were shipped off to Los Angeles?

6    A.   I have no idea.

7    Q.   Now you were shown Exhibit 258 and 260 that were

8    sitting in front of you.   I'm sorry.

9              MS. FLYNN:   Your Honor, may I approach to --

10             THE COURT:   You may.

11         (Pause.)

12   BY MS. FLYNN:

13   Q.   The two documents sitting in front of you --

14   A.   Yes, ma'am.

15   Q.   -- have you ever seen those documents before coming

16   into court here today?

17   A.   Not that I recall.

18   Q.   And Mr. Reed asked you some questions about a civil

19   judgment against you.

20   A.   Yes, ma'am.

21   Q.   What time period did that stem out of?

22   A.   '89, '90.   I don't know.   I can't remember.   It's

23   all --

24   Q.   And then it didn't go to trial until about 1996?

25   A.   Something like that.

51

1    Q.   How much was the judgment that the jury entered against

2    you?  Do you remember?

3    A.   Yes.

4    Q.   What was that?

5    A.   A dollar.

6         MS. FLYNN:   I have nothing further, your Honor.

7         THE COURT:   This would be recross examination --

8    strike that -- redirect examination, I'm sorry, by Mr. Reed

9    on behalf of Mr. Gibson.

10                     REDIRECT EXAMINATION

11   BY MR. REED:

12   Q.   So the judgment was for a dollar which is the amount of

13   damages you had to pay or somebody paid; is that right?

14   A.   Yes.

15   Q.   Did that make the judgment any less a judgment?

16   A.   As far as I was concerned.

17   Q.   Still a judgment, wasn't it?

18   A.   Still a judgment.

19   Q.   Still a judge sitting in the courtroom wearing a black

20   robe just like the judge in here; right?

21   A.   Sure.

22   Q.   Still some jurors just like those jurors sitting over

23   there; is that right?

24   A.   Yes.

25   Q.   And they came back and they stood up and they handed a

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1  thing to the clerk and who handed it to the judge who said,

2  "We find in favor of Mr. Daugherty" against you; isn't that

3  correct?

4  A.    Yes.

5  Q.    Did it make any difference at all how much the money

6  was?

7  A.    To me?

8  Q.    Yes.

9  A.    No.

10  Q.    A judgment is a judgment, isn't it?

11  A.    Yes, sir.

12  Q.    Now, you don't remember whether or not or exactly who

13  it is that went through those documents after they were

14  taken from the cell wherein they were sealed -- or outside

15  the cell -- but you know it happened; isn't that correct?

16  A.    I'm fairly certain it had to happen.   Otherwise

17  somebody is -- somebody would have had to go through it just

18  to obtain what they were looking for.

19  Q.    And at the time you guys were going through that stuff,

20  you and Mr. Tolson just put it in the box; is that correct?

21  A.    As best I can recall, yes.

22  Q.    Now, think back in your mind's eye.   That document that

23  I just showed you, 258, the one that's printed and

24  reduced --

25  A.    This one?

53

1    Q.    Yes.

2    A.    Yes.

3    Q.    If you found that in 1992, where would you take it?

4    Who would you turn it over to?

5    A.    To my supervisor.

6    Q.    Okay.  Would it eventually go to SIS?

7    A.    Yes.

8    Q.    Because that's the people that do that; right?

9    A.    Sure.

10   Q.    In 1993, where would it go?

11   A.    Same place.

12   Q.    1994?

13   A.    Same place.

14   Q.    All of the time, SIS; is that right?

15   A.    As far as I know, yes.  If I had it, that's where it

16   would go, yes.

17   Q.    2001, it goes to SIS, wouldn't it?

18   A.    Yes.

19   Q.    And in 2002, it would go to SIS; right?

20   A.    Yes.

21   Q.    So you guys take the documents that are found in Dave

22   Sahakian's cell, sealed them up, take them to SIS to this

23   locked facility you're talking about, at the very place

24   where the documents that if you found that anytime in the

25   '90s, you would have had that in the same place.  And then

*DEBORAH D. PARKER, U.S. COURT REPORTER*

54

1   the documents are gone through by somebody where there's an

2   ATF agent or a BOP person and gone through page by page;

3   isn't that correct?

4   A.    As far as I can tell, somebody would have had to have

5   gone through it, yes, sir.

6   Q.    And that's at the SIS office wherein those documents

7   stayed for some period of time; isn't that right?

8   A.    Really don't remember how long they stayed there.

9   Could have been a week.  Could have been two months.  I

10  don't know.

11  Q.    You may have been working for SIS right around that

12  time; is that correct?

13  A.    I think I probably was.

14  Q.    Do you know Danny Shoff?

15  A.    Yes.

16  Q.    Was he at SIS at that time?

17  A.    Yes, I think so.

18  Q.    He had been -- he had left ADX in 2002 and by

19  October 2002, oh, Danny Shoff was working right there in

20  Marion, wasn't he?

21  A.    Yes, sir.

22  Q.    Thank you.

23          MR. REED:  I have no further questions.

24          THE COURT:  Questions on any redirect,

25  Mr. Steward?

*DEBORAH D. PARKER, U.S. COURT REPORTER*

1              MR. STEWARD:  No, your Honor.

2              THE COURT:  Mr. Mills.  All right.

3              Mr. White on behalf of Mr. Bingham, redirect?

4              MR. WHITE:  No, your Honor.

5              THE COURT:  Mr. Calabria on behalf of Mr. Hevle,

6    redirect?

7              MR. CALABRIA:  No, your Honor.

8              THE COURT:  And government recross?

9              MS. FLYNN:  No, your Honor.

10             THE COURT:  Thank you, sir.  You may step down.

11             THE WITNESS:  Thank you.

12             MR. REED:  Your Honor, I have two stipulations,

13   one which is ready and one which isn't.  I would ask the

14   court's indulgence, perhaps if we take our break now, then

15   that way I can read the stips into the evidence and then I

16   can rest.  Or I can read one and then wait and do the other.

17             THE COURT:  Why don't you read the one and then

18   we'll read the other one after the break.

19             MR. REED:  Okay.

20             THE COURT:  All right. This is the first

21   stipulation entered into between the government and the

22   defense.

23             MR. REED:  It is stipulated between the parties --

24             THE COURT:  Slowly.

25             MR. REED:  It is stipulated between the parties

*DEBORAH D. PARKER, U.S. COURT REPORTER*

## CERTIFICATE OF SERVICE BY ELECTRONIC MAIL

I, Adrianna Benitez, declare:

That I am a citizen of the United States and resident or employed in Orange County, California; that my business address is 404 W. Fourth, Suite, C, Street Santa Ana, California 92701; that I am over the age of eighteen years, and I am not a party to the above-entitled action;

That I am employed by Kenneth A. Reed who is a member of the Bar of the United States District Court for the Central District of California, at whose direction the service by electronic mail described in this Certificate was made; that on May 25, 2006, at Santa Ana, California, a copy of:

Motion in Limine to exclude Govt. Exhibit 2, 3 for violation of court order

Was sent to the following: (see attached list)

This Certificate is executed on November 2, 2006 at Santa Ana, California.

I certify under penalty of perjury that the foregoing is true and correct.

Adrianna Benitez